Judges, the issues in this appeal derive from the bankruptcy court's ruling that the plausibility standard of Twombly and Iqbal, the Supreme Court cases, applies to the Rev-Op Group's admission or denial of the allegations in a declaratory judgment complaint. And it's important to understand in this context that we're not talking about the sufficiency of counterclaims or of affirmative defenses. These were merely denials. Even though the bankruptcy court imposed a pleading standard that is not remotely supported by the case law or the language of Rule 8 of the Federal Rules of Civil Procedure, the bankruptcy court refused to permit the Rev-Op Group an opportunity to amend those answers to meet this new standard. The court then ignored declarations and other cases on file in the case, but not in the answer itself, and determined that no genuine issue existed and granted judgment on the pleadings in favor of the plaintiff, ML Manager. You're referring to the July 27, 2010 order? The declaratory judgment order, correct. Right. Okay. Where in that order does he talk about Twombly and Iqbal? Well, it – I'm not sure it's in the order itself. It certainly is in the memorandum decision that led up to that order. So the litigation occurred in two phases, Your Honor. The first was there was filing complaints, answers, and counterclaims, and then there was a motion for partial summary judgment on the issues of an agency coupled with an interest. Thereafter, there was a motion for judgment on the pleadings. And in the context of the motion to judgment on the pleadings, at hearing the judge said, well, why aren't these denials subject to this heightened pleading standard, Twombly and Iqbal? The parties briefed that. He issued a memorandum decision on Twombly and Iqbal that preceded the declaratory judgment order. But the rationale was certainly part of that order. And I'm happy to look through the order and point to you in that order. You're basically complaining, though, putting all that aside for just a second, you're really complaining about his conclusion that your clients were subject to the agency agreement, correct? Well, that's correct. That's the bottom line that you're complaining about. Well, ultimately, that is correct. What's at issue in the appeal, however, Your Honor, is not about that conclusion necessarily. It's the fact that we didn't even get a chance to show him that we're not subject to that agreement, that our agreements with Mortgages Limited were very different than the blank form agency agreement that ultimately we were held to be bound to pursuant to no executed agreements, no evidence in the record, and based on our denials in the motion for judgment on the pleadings. But Judge Haynes, in that order, repeats over and over again that based on the evidence in the record, there was no plausible way to deny that the agency agreement was applicable to your client. And that's the bottom line. It's the fact that that ML manager did have the powers given to it by the agency agreement, and he bases that not just on the bare denial, let's say, or lack of knowledge in the answer, he bases that on the entire course of proceedings that he had presided over for years before that. Isn't that correct? Well, two things about that, Your Honor. The short answer is that's not quite correct, and here's why. First, Judge Haynes, he didn't really say that in the order. What happened was ML manager's counsel submitted a form of order that Judge Haynes essentially adopted wholesale. So it's not as though he were the draftsman of the order and was going back and looking through the record and determining what happened at specific hearings. It was a form of order that was submitted to Judge Haynes. He struck a paragraph about reaffirmation, and he adopted the order wholesale. And this Court's president says you can look at that kind of adoption, especially with respect to those kinds of findings, especially on a motion for judgment on the pleadings, with heightened scrutiny, and that on a motion for judgment on the pleadings, which is judgment on the merits, that the standard is you have to show beyond doubt, beyond doubt that the plaintiff in this case is entitled to relief. Did he talk about it being a sham? He did not. He did not. And that's one of the points we raised in our briefing. There was never a suggestion at the bankruptcy court level below that the denials were a sham. We explained why we framed our denials in that way. There was never a Rule 11 motion brought or threatened. There was never a motion to strike. There was no suggestion that the denials were shams. Yes. I understand. But it just strikes me that if you read it, what the judge is thinking of, this is a sham. He may not have said it, but it certainly looks like it. Well, he certainly didn't say that. And the way he got from point A to point B was not to refuse to accept the denials. He got there by imposing a heightened pleading standard. So on the record in front of this Court, he certainly never suggested, and I don't think there's anything in the record that remotely shows, that these were shams. We explained why we denied them that way. And if you look in the appendix of documents that was attached to the complaint, there were multiple agreements attached going back to 2004, 2005, by the same name. So within ---- If you say A and he says, I don't believe it can be A, isn't he in effect accusing you of a sham pleading? Well ---- I know the word didn't come up, the S word. The word sham did not come up. Yes. I don't even think the suggestion that those were made in bad faith came up, Your Honor. And more to the point, even if he thought that that were the case, there was evidence in the record. In fact, the only evidence in the record of which he said he took judicial notice were a number of declarations by my clients. Now, one of those declarations says, hey, you know, the agreement that I have, it's not the same as the agreement ML Manager says applies to me, or that at that time Mortgage is Limited has. It's been altered. There's been potential fraud here. The one that I have has strikethrough. And that is in the record at tab 99 in our excerpts of record, the declaration of Lewis Murphy. Jim Schneck, who was another investor, also at tab 97, exhibit 31 attached to the complaint. He attached a number of documents there. Well, the only agreement related to the Rev-Op type asset attached to the complaint there was a purchase agreement that had expired by its own terms. The other agreement that the report binds us actually says on its face that it relates to the Annual Opportunity Program. It has nothing to do with the Rev-Op type of investment. My question really is going to be for your adversary. It just strikes me that you don't get from point A to point B on this record without sham, and you can't do it with, you can't solve it with Twombly. Anyway, that's going to be a question for your adversary. And for whatever it's worth, I totally agree with Your Honor. I don't think you can solve it with Twombly and Iqbal. And to the extent that the Bankruptcy Court believed that these were shams, the record sort of contradicted that belief, plus their Supreme Court precedent that tells us a judge's belief or disbelief can't form the basis of a dispositive motion. The pleading standards under Rule 8 don't really provide for that. And the trigger, if you will, the way to remedy that that came up after the sham case, which is the NLRB case, which is a 1964 case, Rule 11 was amended in 1983 to deal with this. So it's never been the law that denials have to be supported by explication, evidentiary support, or anything else. A denial is a denial. And if it's made in bad faith, then it is incumbent on the other party to say, hey, these are made in bad faith. Identify that. Make a Rule 11 demand or take appropriate action. That didn't happen here. But he says in his order, in paragraph 52 of that order that you're appealing, he says, During oral argument, counsel for Revop was asked if there was any evidence to support the conclusion that your clients did not sign one of three different agreements that incorporated the agency agreement. And that was the Revop agreement itself that you had been operating under, the subscription agreement, or the private offering memorandum. And he said all of those incorporated the agency agreement, and there's no plausible evidence that I've seen throughout these years of dealing with this that shows that you didn't sign one of those or weren't bound by one of those. So he wasn't basing it just on the denial, it seems to me. And he goes, and he must say that three or four times in this order. So it isn't just on the denial and the application of Twombly or Iqbal to what really wasn't a denial in your answer, it was a lack of knowledge. And he says that's just not plausible to me. You know whether you signed this or not, and I don't see any reason to think that you did. And so, you know, it isn't just based on the pleading itself. I think that's an oversimplification. Well, three things about that, Your Honor, if I could respond to it. First, again, the proposition that somehow the bankruptcy judge drafted this order and made those observations, I don't think is quite accurate. This was an order drafted by an opposing litigant who was about to prevail on a motion for judgment on the pleadings, and the judge signed off on it. And so I don't know that there's a degree of deference that's owed when the judge is not the draftsman of that kind of order. In fact, the precedent in this circuit is you look at that with particular scrutiny. Now, what level of scrutiny is not entirely clear, but it is to be looked at with, you know, suspect eyes. That's A. B, if the judge truly disbelieved it, the way to test the sufficiency of evidence pre-trial is a motion for summary judgment. And Rule 8, as it was amended to the notice pleading standard, was a clear departure from the prior practice, and summary judgment became that pre-trial device. So in a sense, if you're requiring us to prove up at the pleading stage through a trial, I think I have suspicions about that, that really does shift the initial evidentiary burden and it turns the complaint into a presumptive judgment. If we were to agree with you, what would happen next? You would go back and amend your answer and then have a trial, and then what? I think that's correct. I didn't mean to interrupt you. No, I'm saying I was talking to myself. At my age, that happens. Go ahead. I think that's correct. So if there's reversible error here, and we think it's pretty clear that there is, the remedy is remand, allow us to amend our answer if we're being held to this standard. If we're not being held to a Twombly-Iqbal type standard for denials, then I think the complaints can stand. We did propound discovery. And that's worth noting as well. Did we have complete records? No, we didn't. Can you fault us for that? I guess maybe you can a little bit. But the fact of the matter is, whatever was in Mortgages Limited's vault was passed somehow to ML Manager. They provided us some documents here and there to look at. Finally, they attached what they thought were the records applicable to the complaint. We propounded discovery to actually inspect the originals, look at all the documents. We never got that. Well, I think this gets us back to the mootness point then, because if you were to go back and redo that, how do you unscramble those eggs? Well, again, at a minimum, this would be a case where, at least prospectively, the relief could be granted if you determine that the eggs are in the vault. For the six properties that are left? Is that what you're saying? Well, let me address that, Your Honor. I didn't mean to interrupt. No. It's not just the six properties that are left. There are significant litigation claims that can come in. There are other ways to make us whole. The liquidating trust in this case is sitting on a number of large litigation claims. But unlike in the last case, now all of a sudden you've got people who never had any dealings with ML. They have now simply purchased properties that were available at a fire sale. So in order to undo this, you've got people who had no dealings whatsoever with the company that's gone bankrupt. Well, they didn't have dealings with the company that's gone bankrupt, but the company that's gone bankrupt ceased to exist upon confirmation of the plan and the effective date of the plan. And the party they did have dealings with was ML Manager. And certainly we showed up on all the title reports as having fractional interest in the deeds of trust, that we actually owned portions of this real property. And so they did have interactions with ML Manager. You've now got to reverse sales of property to people. Well, one of the things you could do is, like in the Ninth Circuit BAP opinion of PW, and the way that you would do it with, for example, a secured creditor, who has a type of property interest is just to say, well, the lien's reinstated. And you could certainly do that for us to say, hey, you know, we'll give back any money that we got from the proceeds of these sales, and you have a tenant in common interest. These sales were insured by title companies that bore the risk knowing that these issues were going up on appeal. So I think that there are remedies that may be available. If the ownership interest remained intact with respect to the properties, the red would return funds that it received from ML Manager. At a minimum, like I said going forward, I think there could be remedies available very easily. You've got, just to circle back to a point that Judge Wallace made in the previous argument, you did seek a stay here, but you had four sales, that issue, and two of them you sought a stay, and the other two you did not. Is that correct? That's correct. That's correct. And there again, the threat was, hey, you've got to post an $80 million to $90 million bond. We did seek a stay. On the declaratory judgment and the first two sale orders, we kind of packaged those up. And again, Judge, I think it's a little disingenuous of ML Manager to say, well, you should have gotten a stay. You had to appeal all these orders when it was controlling all of our property. The substantial net worth of all my clients were tied up, and ML Manager was asserting agency control over all the property, all the money. We didn't have access to the kinds of resources that we needed to effectively do it. And I also think it's worth mentioning, we briefed this a little bit, that this could have easily been kicked over to the bankruptcy appellate panel, which is where we appealed the stuff in the first instance with the other appeal at a minimum, and they just kept kicking it over to the district court, which at that time, unfortunately, Judge Roll down in Tucson had been killed in the Gabby Giffords thing. We were short a judge there. And then Judge McGill was called up to this court. And so the district court was extraordinarily busy, and that certainly was through no fault of the Revop investors. So there are a couple things. They kicked it to district court. There we were. It was a very busy docket, as you know, in Arizona. And you had a visiting judge from Nevada where they're not quite as busy. Well, and they did. And they did bring in a visiting judge, Your Honor. I have about three and a half minutes left. I'd like to reserve that. Well, can I just ask one more question, if that's all right with my friends here? Didn't Judge Haynes originally decide that the debtor in possession at the time, in November of 2008, had the authority to modify these loans? I'm looking at an order dated November 25, 2008, in which he was dealing with one of the properties involved in this appeal, the University and Ashe property. And there was an issue about whether the debtor in possession had the authority to modify the loan. And he said the agency agreement gives the debtor the authority to modify the loan. And doesn't all of his other decisions kind of flow from that initial one? The answer is, in effect, they may have flown or been consistent with that, but they didn't flow directly from that decision. The answer to that clearly is no. And the reason I say that is because that litigation, and we briefed this in our briefs, it was in our reply brief in particular, that litigation was confined to that particular deal. All the parties knew it. There would have no preclusive effect. The OIC, which became the plan proponent, really urged the judge that, you know, every agency agreement, every transaction, every contract was different. You've got to consider them on a contract-by-contract basis. I can tell you this, at no time during the course of these proceedings, at any time, did Judge Haynes, as far as I know, ever look at an individual agency agreement for a particular investor. It was always pursuant to a form agency agreement. And on our motion to clarify, he further clarified when we moved for reconsideration, we've also briefed this in our reply brief, that he had not made that determination, that the determination was not yet ripe, that he had not determined whether we were bound by a form agency agreement. So his decisions may have been consistent, but they didn't flow from there. He did not give that preclusive effect, certainly not with respect to my clients. He made that abundantly clear in his order denying reconsideration of that clarification order. Roberts.  Thank you. Morning, Your Honors. Keith Hendricks on behalf of ML Management. May it please the Court. I'd like to begin right where Judge Kettleman's question, because I think that is the important place to start. University & Ash is one of the properties that was actually subject to one of the sell orders here. It's one of the properties in which the RevOps, these particular, this small subset of the RevOps investors, and that's very important, this group is only 13 of 50 or 60 RevOps investors. They are one of hundreds of pass-through investors. So this is a very small subset of similarly situated investors. In the University & Ash situation, this was the test case. When we were there in front of the court, he kept asking us, you have been talking about the agency issue for two months now. When are we going to decide the agency issue? And there was a bunch of loan modifications, because the debtor in possession at the time, their plan was to reorganize the lending business. And they wanted to save their ability to lend to borrowers. And so they were modifying the loans that were out there without the investor's consent in favor of the borrowers. And we got to a point where we had negotiated some, and they went through. But University & Ash, what they wanted to do was eliminate all of the loans and turn us from debt to equity. So we would be on the back end of a condominium project where we would be subordinated to front-end people. And the investor said, no, we would be wiped out in this market, and they refused. And so we had a trial on whether or not you could turn debt to equity, whether or not you could subordinate the notes, whether you could forgive half of the indebtedness, whether you could cut the interest rates in half, and whether or not you could eliminate all of the personal guarantees. And Judge Haynes unequivocally said, yes, the agency discretion the agency agreement, in this case, gives the agent unfettered right to modify these loans. We call this the bus driver decision, because what Judge Haynes ruled in that position was that the agent was the bus driver for this loan portfolio, and it could make all the decisions. And so the committee that myself and Ms. Reese represented at the time made the decision, said, okay, if the bus driver, if we're locked on the bus with this bus driver, we've got to change the driver. We've got to get rid of the debtor in possession and put a group of investors driving that bus so that the investors can make the decisions. And we're all locked on the same bus. And the issue there was you can't have these fractionalized interests in a $900 million loan portfolio, each running their own separate ways. The judge had already ruled that one bus, there would be one agent who would be driving the bus, and we wanted to replace that. And so that was the context of the plan. And that was where we got to at the beginning. And I want to pick up a point that Judge Bybee asked, and that was what was the benefit? Why would you not transfer into the loan LLCs and stay out? The reason was because of the security of the collateral. If you transferred into the loan LLCs, and it gets very technical, and I'm sorry I can't explain it all, but, I mean, this was years, but we had to have a vehicle where we could have a borrower. The debtor didn't own the loans. The debtor was the agent. He was the bus driver. He had valuable rights as the bus driver. But he didn't own the loans and couldn't pledge the loans themselves as collateral for this $20 million loan portfolio. And if you think about it, we have a loan portfolio of 56 defaulted loans, every one of which was in default, and we needed to borrow $20 million at the bottom of the deepest recession. It was a very daunting challenge. We can't come out of bankruptcy unless we pay the administrative costs. Administrative costs are $20 million. We've got to be able to get the financing for that. And so we had to have an ability to pledge the loans. We came up with the idea of, and Ms. Rees, my partner, came up with the idea of these loan LLCs. Now, there was a lot of reasons that we can go into it, but the pass-through investors were specifically given the option. You can go into the loan LLCs, and you can be part of the management where you can have a vote on the management, or you can stay outside under the agency agreements. But the big difference was if you went into the loan LLCs, your loans are collateral for the loan. And if there's a default on the loan, your loans are subject to being lost. You stay outside, you have to pay the same amount. We're not going to let people who stay outside get a free ride and not pay their share of the costs, but you don't have to put your loans up for collateral. And there was a big discussion, and some of the pass-throughs, about 50 percent went in because they wanted to vote on what was happening, or some said, no, I'm scared that you guys may not even succeed. It may be defaulted. I may lose everything. I'd rather keep at least a fractionalized interest even if I don't have control. And so they stayed on the outside. That was the basis of the plan that went forward, and that was the basis of what was litigated. I wanted to make a note here now on mootness that really dovetails into that, because this motion for clarification and then this agency motion, they all dovetailed because people had to make the decision. Again, the rev ops are just a minority interest. They're just a few of these people. There's a lot of similarly situated people. And so when they came up and said, wait, wait a minute, if we don't transfer in because we're not a borrower, we may not be liable to repay that at all, people said, well, wait a minute. That's not what we thought was going on. And so they specifically held off on the decision, because this was a security, and we had to get approval from the SEC for the bankrupt entities to transfer their issues in. And the SEC gave us a short window, and we got the SEC to grant an extension to that window until they could define this issue of the clarification. And when Judge Haynes ruled, he said, no, that's exactly what everybody at the hearing testified to. Everybody's going to be subject. They're going to all have to pay their fair share. The agency agreements are all going to be transferred. He said, no, you guys are saying that you may have a defense agency agreement. We'll deal with that later. But he said the agency agreements are being transferred. Everybody has to pay their fair share. And so that is the ruling. This is where is mootness. It would be fundamentally unfair to hundreds of investors with hundreds of millions of dollars to say, okay, well, we're going to redo that decision, and if you didn't transfer in, you're not subject to the exit finance, and you can get out from under these agency agreements, because that was the deal that was cut at the time. And if you remember what was going on, we were incurring $20 million of administrative expenses. And what was facing, the consequences that we're facing here, there were numerous parties that were seeking to collapse the whole thing and argued that it was all a Ponzi scheme. Madoff was out there. There was a lot of other arguments. And these type of fractionalized investments around the country were being collapsed into Ponzi schemes and liquidated. And the evidence at the trial was it would be worth 6 cents on the dollar. That's a $54 million return on a $900 million portfolio. And you still would have to pay the administrative expenses. People were looking at getting $34 million back. And we came in and said if we can borrow the money, do an orderly liquidation so that we could repay the administrative expenses, spread the costs across to everybody, we can get you an 18 to 20 percent return. And that's exactly what Mr. Winkleman's affidavit establishes we did. We took a situation where the threat was to consolidate and collapse everything. One of the points I would like to point you to in the record is the May 18, 2009 hearing. The first argument there was a group challenging these Revop investors' positions, saying they're really just a disguised loan. They are an unsecured creditor because that repurchase obligation makes them a loan. And Judge Haynes agreed with them. And then he said, but there may be an issue about whether they're perfected security interests, and I may recharacterize it because he didn't want to throw them out into the unsecureds. But that was really the big issue. Now, when we get to the agency appeal, the whole point that their argument misses is this question. And the judge actually put it in his order. The very first thing, it's paragraph 17, and it says, and it essentially is, can a Revop investor, not the Revop group, not this subset, but can a Revop investor be within that class of people? Because this is a defined class in the plan. It's class 10B. Can you be a Revop investor and not be subject to the agency agreement? We didn't have a plan for people who lent money to for the unsecured creditors. They're dealt with in the liquidating trust. We, this plan was for the benefit of specific defined groups of investors. And there were three groups of investors defined in the plan, what we call the MP funds investors, the pass-through investors who didn't have a repurchase obligation, and the Revop investors. And the Revop investors is a specific defined term in the plan. And it means an investor who made an investment pursuant to a private offering memorandum that is identified. And the question is, even get away from the Twombly and all the other denials, and Judge Haynes found this specifically, you can find that they're subject to the agency agreement because they are by definition a Revop investor. And a Revop investor is by definition under the private offering memorandum subject to the agency agreement. And you can do that on the pleadings without any facts, right? Exactly. Why is he able to do that? The only way that you can challenge at that level, we're talking about challenging just on the pleadings, no evidence at all, is if you go through Rule 11. We've been clear on that. There's no effort to go through Rule 11 to have it stricken. I'd like to have you tell me how, if you feel that you have a point here, the PAE case authored by Chief Justice Kuczynski is very strict on this issue. The Court may only review claims for legal sufficiency and must await summary judgment unless under 12f, unless they come through Rule 11. And as Twombly and Iqbal do count, you can't just set them aside. But they've been restricted by the PAE case that you've got to go through Rule 11, which wasn't done here. What's your response to that? I would like to add to the facts that I think that you're overlooking. There was more than just a question. What had to do with whether they signed some documents? And they said they didn't, and you said they did, or vice versa. But it was an evidentiary question. It's an evidentiary question. They filed an answer and a counterclaim. In their counterclaim and in one of their related parties' complaint, they make an affirmative allegation. And the affirmative allegation is that their investments were pursuant to the POM cited by date. They had an affirmative allegation that their investments were under the private offering memorandum. So now you have, in the judgment on the pleading, where you can take the pleadings as a totality. This is not a motion to dismiss, and that's why we brought it under the judgment on the in their counterclaims, that their investments were pursuant to the POM, and that they were a member of the Rev-Op class under the plan. You can now construct, can say, okay, we know that the POM exists and they say that they're under it. We know that they're a Rev-Op investor. Now it's a legal conclusion. And then we specifically identified and attached. Wait a minute. You just jumped over something. I'm sorry. The issue, the issue was whether they signed a document. Now, you're working around it through some legal process, but we're talking about whether on a motion on the pleadings, you can make a determination of facts which ordinarily have to wait for summary judgment because of Twomley, that in effect what they're saying is we can't believe this because of something else. With all due respect, Judge Wallace, I disagree that it was based on whether they signed a document. Judge Haynes specifically found that their investment under the POM without any signature binds them to the agency agreement. And he made the findings of the incorporation into the agency agreement and that they could be bound without any signature by their actions. Now, in the ruling, in the ruling on the pleadings, where do we find that he said that? I can direct you to it right here. Try paragraph 18. Begins in paragraph 18, and he talks about it, but there's several other ones. He finds that they're bound under any of three documents. They don't have to have all three, but any of the three. And he talks about in 18 and 17, 18, and 19. And then he finds in also in, if you'll excuse me, I, paragraph 57. When he starts talking about paragraph 57, the, and then there's one where he says that they're bound under any of the documents. And so it's not just the two documents that they signed, but it's also the investment program itself, which is the basis of the plan class. Let's assume they didn't sign the documents. They didn't. If they were not a Revop investor. Let's assume they didn't sign the documents. They're an unsecured creditor. They would be an unsecured creditor. And they can take that position? Yes. They could take that position. And it was under the motion, judgment on the pleadings, that position was rejected. That would have to be. Well, it's rejected. There would have to be a Tom Lee approach, wouldn't it? It would be. It was rejected that they could recover and under the classification of the plan. It was rejected that they could be an unsecured creditor, not subject to the agency agreement, and be within the plan definition of a Revop investor, because that was the issue that was being litigated. So they can have a claim in the liquidating trust as an unsecured creditor. There's $2 million. Assume they assume their position is correct, that as a matter of fact they didn't sign any document. Well, they admit in their answers, they said, we admit we signed a document with this title, but we lack information as to any other allegation. Their allegations in their complaint, and everyone, and the declaratory judgment goes through that very specifically, identifies where they admit they signed, each one of them individually. I admit I signed a document entitled new investor subscription agreement, but I have I lack further information as to any other allegation. Every single one of them did that. They said they specifically admit signing documents, but they deny, they say we lack information as to whether or not it is something other. And Judge Haynes says, okay, you admitted you signed a document with that title, so they have that within their knowledge. He said, why can't you tell me if this is the document you signed that was attached to the complaint? And what they came up with was Lewis Murphy's affidavit. And this, I think, is very critical. Lewis Murphy's affidavit deals with what we called in the case the grant of discretion. Judge Haynes, in his order, says that there's two agencies involved in these programs. There was the loan management agency, and that's the term he uses in the order, and then the loan selection agency. In the subscription agreements and in the REVOP agreements, there was a grant of selection, a grant of authority that could be extended to allow Mortgages Limited to decide which loans to put this pool of money into. And some of these people said, no, I don't want to give you that selection authority, and some of them said yes. Judge Haynes specifically said, we're not going forward. We're not making any new loans. The loan selection agency is now irrelevant. The only thing we're talking about is the loan management agency. And he says, the only way I can harmonize all of these documents is to say that the grant of discretion only applies to loan selections. And so whether they eliminated that section, whether they crossed it out, whether they granted it or didn't grant it, was irrelevant to Judge Haynes' decision that was consistent from the beginning, the bus driver, that the loan management agency was irrevocable, and that there would be one agent managing this entire portfolio because of the loan. Doesn't that sort of sound like he's saying this is a sham? He said specifically, and it's in the record, their denials lack credibility. Yeah. He didn't say sham, but he said. That's the same thing. But isn't that the problem, that if they lack credibility, there should have been a Rule 11? That's what Chief Judge Kaczynski is saying, that you can't get around, by talking to Tomley or Iqbal, if you're saying lack of credibility or sham, you have to do Rule 11. Now, how would you distinguish that case? In the first place, I don't believe that applies to the – at all to the issue of whether they're bound under the private offering memorandum, because no signature is required there. Their affirmative admission in their pleadings and their assertion that they are in this defined class establishes that they are an investor under that program, and that by itself bound them. Now, as to the other ones, I believe that – and the question is, is the sufficiency of the affirmative defenses. And we've cited to you and acknowledged that there's been no circuit court taking it up, but the district courts, and there's been another of them, saying that if you're asserting – and specifically in this case, where they admit they signed the document with the same name, but they – and they didn't deny it, they just say we lack information sufficient to form a belief. And the court said that's not credible, especially given the University and Ash litigation, especially with all we went through. Yes. And if you'd just gone to summary judgment, we wouldn't be standing here now. In all – Your Honor, in all candor, the reason that that happened was because this was a situation of their own making. We had a year and a half before we defaulted on the summary judgment, and we couldn't sell property because these people were going around in the town advertising, saying this person doesn't have agency. We needed – and I would commend to you Judge Murguia's decision on the motion for stay. This was critical. The whole thing was on the razor's edge of collapse, and time was of the essence. We had to raise money because those people who lent us the $20 million on a defaulted portfolio, and the buyers in the market were being told you don't have the authority to sell these properties. The whole thing was on the brink of being collapsed into a liquidation, six cents on the dollar. And so the reason that we didn't do summary judgment in all candor, Your Honor, was because we didn't have time for discovery. We had to sell, or the whole thing, and there would have been the $200 million that we've recovered would have been lost. And I understand that that, you know, I would in a normal situation, but that's why a bankruptcy plan has the fluidity that we're here, and I see I'm over my time, so unless you have any other questions. Sotomayor, this is very important. I'm glad for the explanation. Thank you, Your Honor.  Thank you, Mr. Hendricks. Mr. Suzuki. Now, tell me where you disagree with your adversary. Well, just a few points. First, with respect to the allegation, and it is demonstrably false, that we alleged or admitted that we invested pursuant to a private offering memorandum. That is categorically false, demonstrably false. I would point you to any of the answers and counterclaims. Paragraph 14 of each of those counterclaims says that the Revop investments were offered by Mortgages Limited for the first time in 2006 pursuant to a private offering memorandum. We never said that we invested pursuant to that private offering memorandum, and we were very careful about that. Well, how did you invest? What was this plan that you invested your money with? Mortgages Limited was, I think at the time it collapsed, about a 25-year-old company. It was founded by a fairly well-respected guy, Scott Coles. It was a Scott Coles senior who was well-respected. After he passed away, it was left to his son, Scott Coles, Jr. Scott Coles was the entirety of the operation. He would get on the phone with any one of my clients, and they would discuss investment opportunities. It was not pursuant to the private offering memorandum. In fact, if you go back to the record, we've cited it in our reply brief in the much-touted University and Ash settlement proceedings that we were never a part of, by the way. Never a part of it. They didn't even serve their agency brief on us in that proceeding. But in any event, in that proceeding, there was testimony given, and we've cited it in our brief, that a lot of times the documents came after. The deal was cut. Scott Coles called people. People called him. They cut the deal. The agent even transferred money, and then the documents came. And so that is very consistent with the history of my folks, and my clients really had close relationships. And, again, this is laid out in the Declaration of Brad Murphy. Also in the counterclaim, paragraph 17, we say that we executed one or more documents with mortgages limited. And with respect to the denial that, you know, they say that they executed a document by that name. Well, how can it be anything but the document we attached? Bill Hawkins, who is here in the courtroom, was one of my clients. He had a relationship with Scott Coles going back to 2004. I can't tell you how many documents he signed with the name subscription agreement, new investor agreement. All of those documents went by the same or similar names, and sometimes on 90-day cycles they would be executing new documents following phone calls with Scott Coles. And they all incorporated the agency agreement, did they not? Well, they did not. Some of them did not. And, again, in the Declaration of Brad Murphy that was in the record at the time, and, by the way, we referenced that, and I think we attached a copy, in our motion to quash the order to show cause why judgment shouldn't be entered, which was how they kicked off the case. They filed the complaint, and they got an order to show cause why judgment shouldn't be entered. Now, the judge quashed that, but one of the things we raised in there was the fact that, hey, they can't do this on an order to show cause. There are documents that present significant issues. One of them is identified in the Declaration of Lewis Murphy, and that document clearly was altered. He says it right in his declaration. Whatever they've got, that's not what I signed. I recall distinctly striking through and initialing paragraphs. What they gave back to me, it looks like that's been pulled out and slip-sheeted by someone within Mortgages Limited. And so there were a number of issues. But without the agency authority, how does the REVOP program or any of these investment programs operate at all? Because Mortgages Limited was, in fact, managing these loans, making the loans, servicing the loans, or serving the loans, depending on which typo you want to look at. But wasn't that inherent authority assumed for all this program? For all the investments? Not for all of the programs. So did your client ever say, wait a minute, I'm exercising a veto power, and I don't want you to make a modification? Well, I don't know specifically with respect to a loan modification, but they absolutely said, I'm not going in that loan. Take me out of that loan. I want my money over here. Tempe Town. Well, but that's different than managing a loan or foreclosing on a property or selling a property. Did that ever happen? That didn't happen simply because we were in the run-up, the bubble, the bubble, as it were. So the foreclosures and everything, and the ML manager will say in his papers, all of that really occurred after the bankruptcy. To the extent there was a foreclosure and we were fractional interest holders and became tenants in common on real property, I don't know those details as I stand here and how that interacted. But I do know that the deals they had with Scott Coles, who, again, for all intents and purposes, were varied and distinct. And we've given you the law in our briefs about how pattern of practice can modify supplement agreements, how inducement into certain agreements and extraneous evidence of intent can be brought in under Arizona law. And so we think that that's important. One final point. I think the dispositive thing here, and you can do, you know, sort of rhetorical sleight of hand while you're in the plan and you were defined a certain way. We didn't choose that definition. We were sent ballots. We were classified that way. We had litigation over whether we owned the stuff that we ourselves defended. But the admission of counsel at this podium was, well, you may have defenses against the agency agreement. We'll sort that out later. That is directly contrary to this concept that somehow these prior proceedings with Judge Haines later said aren't preclusive. Somehow pigeonholed us. We were bound by the form agency agreement. Clearly, those issues were left over. And whether we had defenses against the agency agreement or even what that agency agreement was with respect to our particular loan transaction was left until after confirmation. And unfortunately, we never got there because we were bound by a declaratory judgment. On a motion for judgment on the pleadings. I think I'm out of time. Okay. Thank you. We thank counsel for the argument, for your skill and familiarity with the record in a very, very complicated and difficult case. But we thank all counsel for the argument today. With that, we've completed the oral argument, calendar, and the Court stands adjourned.
judges: Gettleman, Wallace, Bybee